**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | **CRIMINAL ACTION NO.** |
| | **1:18-CR-452-MHC-CCB** |
| **v.** | |
| **BERTHA AQUINO-BUSTOS and** | |
| **AURELIO PENALOZA-BRAVO,** | |
| **Defendants.** | |

**FINAL REPORT AND RECOMMENDATION**

This matter is before the Court for consideration of Defendant Aquino-Bustos's motion to suppress evidence seized from her cell phone, (Doc. 39), Defendant Aquino-Bustos's motion to suppress statements, (Doc. 41), Defendant Aquino-Bustos's amended motion to suppress evidence seized from her cell phone, (Doc. 44), Defendant Penaloza-Bravo's motion to sever, (Doc. 48), and Defendant Penaloza-Bravo's motion to suppress statements, (Doc. 50).

Defendant Aquino-Bustos's amended motion to suppress evidence seized from her phone, (Doc. 44), supersedes the original motion to suppress that she filed earlier, (Doc. 44 at 1 n.1). The original motion to suppress, (Doc. 39), should

therefore be **DENIED AS MOOT**. Defendant Penaloza-Bravo's motion to sever, (Doc. 48), is **DEFERRED** to District Judge Mark H. Cohen.

In sum, both Defendants made statements to agents during the execution of a search warrant, and they now seek to suppress those statements. Additionally, Defendant Aquino-Bustos seeks to suppress information agents obtained from her cell phone, which she gave to them while they were in the house that was searched. The parties appeared for an evidentiary hearing on May 21, 2019, they have fully briefed the suppression motions, and those motions are now ripe for resolution. For the reasons set forth below, the undersigned recommends that Aquino-Bustos's motions to suppress be denied and that Penaloza-Bravo's motion to suppress be granted.

## I.  Facts

Federal authorities intercepted a package, which contained lava lamps filled with a liquid that tested positive for methamphetamine, that was destined for 4389 Langdon Drive, in Decatur, Georgia. (Doc. 54 at 13). James Ballard, a special agent with the Department of Homeland Security, obtained an anticipatory search warrant for that location. *Id.* at 13–14; Gov. Exhs. 2, 3. The package was delivered to the house on Langdon Drive on October 17, 2018, and after the tripwire agents had secreted inside was triggered—indicating that someone had opened the parcel—they made entry into the house at approximately 5:38 p.m. (Doc. 54 at 15,

65–66). Agents found two people inside the house—Defendants Aquino-Bustos and Penaloza-Bravo—both of whom they interviewed while they were in the location executing the search warrant. *Id.* at 16, 33–34.

### A.  Bertha Aquino-Bustos

Defendant Aquino-Bustos was interviewed first. *Id.* at 33–34. She testified that eight armed agents knocked on the front door of the house (which is where she lived at the time), screamed at her to get out of the house, handcuffed her, and instructed her to sit in the front yard for 20–30 minutes. *Id.* at 101. She was then taken inside, the handcuffs were removed, she sat for a while, and two agents eventually interviewed her in an upstairs bedroom. *Id.* at 17, 101–02. Both agents were "dressed down," they were armed but their weapons were not visible, and Aquino-Bustos was no longer in handcuffs. *Id.* at 17, 20, 102. At that time, Agent Ballard testified, Aquino-Bustos would not have been free to leave the house—in his words, "she was being detained." *Id.* at 48. Agent Ballard recorded the interview with Aquino-Bustos, but she claims that before the recording started, he told her that it was "in my best interest if I talked to him; that it was his decision, he had the power to either arrest me or let me go." *Id.* at 102–03. Agent Ballard, on the other hand, could not recall if he had a conversation with her before the recording started, but he testified that:

3

it's possible I said something along the lines, look, in a minute I'm going to read you your Miranda form, your Miranda rights to you. If you invoke your rights to a lawyer, we've got to stop talking and I can't get your side of the story. I do that with most, if not all, suspects, say your chance to talk is before you are Mirandized — before you ask for a lawyer because once you get a lawyer, it stops. The phrase that I have the power to put you in jail or lock you up is not something that I can recall ever using. So that statement right there is extremely offensive to be honest.

*Id.* at 128–29. Agent Ballard denied telling Aquino-Bustos that whether she would be arrested was conditioned on her cooperation. *Id.* at 129. The undersigned has listened to the recording of the interview with Aquino-Bustos, and it appears that Agent Ballard was in the middle of saying something when the recording starts — it sounds like he says the word "good" before the first question he directs to Aquino-Bustos. (Gov. Exh. 1).[1] But it is not possible to tell from the recording whether whatever Ballard was saying before he turned on the recording device

---

[1] The recorded interview is Government's Exhibit 1. Counsel for Defendant Penaloza-Bravo introduced a transcript of Aquino-Bustos's interview that was prepared by the Federal Defender's Office, as well as a transcript of Penaloza-Bravo's interview (which was conducted in Spanish). (Doc. 54 at 123–24; Def. Exhs. 3, 4). The Court has listened to Aquino-Bustos's interview in full and cites the actual recording in this Report and Recommendation, while noting that the parts of the written transcript that I have reviewed appear accurate and that the transcript was helpful to the Court. For Penaloza-Bravo's interview, the Court will cite to the written transcript, which was prepared by a translator.

was part of a conversation with Aquino-Bustos (and, if so, what was said), part of a conversation with someone else, or a stray comment that he made to himself.

The recorded conversation between Aquino-Bustos and the two agents lasts for roughly 39 minutes. (Gov. Exh. 1). Agent Ballard advised Aquino-Bustos of her *Miranda* rights approximately four minutes and 20 seconds after the recording began. *Id.* During the less than five minutes prior to *Miranda*, the agent asked Aquino-Bustos her name, her parents' names, her date of birth, her social security number, whether she has a work authorization card, her current immigration status, and how she originally entered the United States. *Id.* Aquino-Bustos answered all of the biographical questions, and she gave details about how she entered the country at the age of six with the help of a "coyote" and then went to live with her mother, who was already established in Atlanta. *Id.* After that series of questions, Agent Ballard advised Aquino-Bustos of her right to remain silent, that anything she said could be used against her, that she has the right to consult with a lawyer before questioning and to have a lawyer present, and that a lawyer would be appointed free of charge if she could not afford to hire one. *Id.* at 4:20. Aquino-Bustos (who told the agent that she preferred for the questions to be in English, as opposed to Spanish) said that she understood her rights and was willing to waive them and speak without a lawyer present. *Id.* at 4:20–4:45.

5

In the course of the interview, Agent Ballard asks Aquino-Bustos if he can search her phone, and she gives permission for him to do so. *Id.* at 8:15–8:30. She provided him with the passcode that he needed to unlock the phone. *Id.* at 29:25–30:05. And it is clear from the recorded transcript that the agent looked through the phone during the interview because he commented on certain pictures that showed drug activity. *Id.* at 38:00. Defendant Aquino-Bustos does not, in the recorded interview, ever ask for her phone back or in any way withdraw her consent to search, and Agent Ballard testified that she likewise never made such a request or demand at any point after the interview concluded. (Doc. 54 at 27). Aquino-Bustos was arrested at some point after her interview but before the agents concluded their search of the house. *Id.* at 120.

Aquino-Bustos testified at the suppression hearing. She said that Agent Ballard made her feel uncomfortable when, prior to the *Miranda* warnings, he asked her questions about her family. *Id.* at 104. She testified that she understood her right to remain silent and to have an attorney present, but that she felt that she had to keep talking to him because she initially told him that she would talk—in her words, "I didn't think I could stop." *Id.* at 104–05. She conceded, however, that she never communicated her understanding—that she had to keep talking—to Agent Ballard during the interview. *Id.* at 110–11. Defendant Aquino-Bustos

acknowledges that she told the agent that he could search her phone, but her "understanding" was that he was going to "[s]earch it at that moment." *Id.* at 105.

### B.    The Phone Search Warrants

Agents conducted the interview with Aquino-Bustos on October 17, 2018. *Id.* at 15. On October 22, 2018, Agent Ballard obtained a federal search warrant for a number of phones that were seized during the search of Langdon Drive, including the one that he obtained from Aquino-Bustos. (Doc. 54 at 28; Gov. Exhs. 5–7). The warrant required Agent Ballard to execute the warrant by November 2, 2018. (Gov. Exh. 6). On October 24, 2018, Agent Ballard "glanced" at Aquino-Bustos's phone for a short period of time—he testified on direct that the search lasted a few minutes but on cross he said that he could not be sure whether it was a few minutes or a couple of hours. (Doc. 54 at 29, 56–57). For the October 24 search, Agent Ballard used the passcode that Aquino-Bustos gave him to unlock the phone. *Id.* at 56. Other than this cursory review, agents did not complete a forensic examination of Aquino-Bustos's phone by November 2, and Ballard filled out the search warrant return indicating that the phones were not searched and the warrant was not executed. (Gov. Exh. 7).

Agent Ballard explained why the phone was not forensically searched. He stated that when he receives a search warrant for a phone, he is supposed to fill out a form requesting that a computer forensic analysis be performed. (Doc. 54 at

30). That form is then sent to a group supervisor, who is supposed to forward it to the group supervisor responsible for the forensic agents. *Id.* Here Ballard filled out the form and forwarded it to his acting group supervisor, who was filling in for the main supervisor, who was out for a few days. *Id.* The acting group supervisor never forwarded the form to the group supervisor over the forensic agents, so Ballard's request never got assigned to a forensic examiner, and the phone was not searched. *Id.* at 30–31.

Agent Ballard applied for and received a second federal warrant to search Aquino-Bustos's phone on December 11, 2018. (Doc. 54 at 31–33; Gov. Exhs. 8–10). He could not recall why he waited until December 11 to seek the second warrant, despite being aware by at least November 21 that the first warrant was not executed. (Doc. 54 at 62–63). He suggested that he might have been called off to do other search warrants or investigative work during the time between the first and second search warrants or that he could have had some vacation days, but ultimately he was not able to give an "exact answer" for the delay. *Id.* at 63, 70. The second search warrant was executed, and Aquino-Bustos's phone was forensically searched on December 20, 2018. (Gov. Exh. 10).

### C.   Aurelio Penaloza-Bravo

Agent Ballard and Task Force Officer Anthony Petrone interviewed Penaloza-Bravo during the execution of the search warrant. (Doc. 54 at 33). When

8

agents first entered the house, Penaloza-Bravo was wearing only underwear, and he was handcuffed and placed in the carport. *Id.* at 35. Later, and before the interview began, agents allowed Penaloza-Bravo to get dressed, and he was wearing pants and a shirt by the time the interview started. *Id.* The interview occurred in a second-floor bedroom, both of the agents and Penaloza-Bravo were seated, and Agent Ballard is not sure if Penaloza-Bravo was handcuffed during the interview. *Id.* at 33, 36. Both of the agents were armed, but neither of their weapons were visible. *Id.* at 36. Agent Ballard testified that, at the time of the interview, Penaloza-Bravo was "detained" and that he was not free to leave. *Id.* at 86.

Agent Ballard, who is fluent in Spanish and who conducted the interview in Spanish, advised Penaloza-Bravo that he had the right to remain silent, that anything he said could be used against him, that he had the right to consult with an attorney and to have the attorney present, and that an attorney would be provided if he could not afford one. (Doc. 54 at 37; Def. Exh. 4 at 2). Penaloza-Bravo stated that he wanted a lawyer present. (Doc. 54 at 37). After Penaloza-Bravo invoked his right to an attorney, Agent Ballard asked him his name, his parents' names, his date of birth, where he was born, when he last entered the United States, what time of day he crossed the border, how long it took him to cross the border, how much he paid the guide to assist with his crossing, whether he had

9

legal status to be in the United States, and whether Aquino-Bustos calls him by the name Guello. (Doc. 54 at 39; Def. Exh. 4 at 3–15). The agents did not ask Penaloza-Bravo any additional questions, and it is undisputed that he was later arrested at some point before the agents left the house.

## II.   Aquino-Bustos's Motions to Suppress Statements and Evidence

Aquino-Bustos moves to suppress the statements that she made to the agents. She argues that her statements were not voluntary, (Doc. 56 at 12–14); that even if her post-*Miranda* statements were voluntary, her pre-*Miranda* statements should be suppressed, *id.* at 14–15; that her consent to search the phone was not voluntary, *id.* at 15–17; that even with valid consent, the Oct. 24 search of her phone exceeded the scope of that consent, *id.* at 17–18; that the use of her passcode to search the phone on Oct. 24 violated her Fifth Amendment rights, *id.* at 18–21; that the first search warrant cannot serve as the basis for the forensic search because the search occurred outside the time restrictions of the warrant, *id.* at 22–24; that the agents waited too long to secure the second search warrant, *id.* at 24–28; that both warrants were overly broad and vague, *id.* at 29–31; and that all of the searches exceeded the scope of both warrants, *id.* at 31–35. The Government has

filed a response brief, (Doc. 58), Defendant[2] has filed a reply, (Doc. 64), and the Court will address the arguments in turn.

### A.   Aquino-Bustos's Statements

Defendant argues that her statements to the agents were not voluntary and should be suppressed. She further argues that even if the Court finds that her post-*Miranda* statements are admissible, the pre-*Miranda* questions should be suppressed. The Government argues that Defendant was not in custody and that even if she was, she made the post-*Miranda* statements after voluntarily waiving her right to remain silent.[3]

### 1. Alleged *Miranda* Violations

The Fifth Amendment requires courts to "exclude from evidence any incriminating statements an individual makes before being warned of his rights to remain silent and to obtain counsel." *United States v. Luna-Encinas*, 603 F.3d 876, 880 (11th Cir. 2010). The entitlement to *Miranda* warnings, however, "attaches only when custodial interrogation begins." *Id.* (internal quotation marks omitted).

---

[2] In Part II of this Report and Recommendation, all references to "Defendant" are to Bertha Aquino-Bustos.

[3] The Government states that if the Court determines that Defendant was in custody, it will not seek to use at trial any of Defendant's pre-*Miranda* statements. (Doc. 58 at 13 n.3).

Interrogation, for purposes of *Miranda*, includes "express questioning" as well as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980) (footnote omitted).

"A defendant is in custody for the purposes of *Miranda* when there has been a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) (internal quotation marks omitted). The court must first consider whether, "in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Howes v. Fields*, 565 U.S. 499, 509 (2012) (internal quotation marks, citation, and alteration omitted). "Determining whether an individual's freedom of movement was curtailed, however, is simply the first step in the analysis, not the last. Not all restraints on freedom of movement amount to custody for purposes of *Miranda*." *Id.* Indeed, "a free-to-leave inquiry reveals *only* whether the person questioned was seized." *Luna-Encinas*, 603 F.3d at 881 (internal quotation marks omitted and emphasis in original). "While seizure is a necessary prerequisite to *Miranda*, a court must also ask whether a reasonable person would have understood his freedom of action to have been curtailed *to a degree associated with*

12

*formal arrest.*" *Id.* (internal quotation marks and alterations omitted, emphasis in original).

A court makes the custody determination in light of all the circumstances and considers factors such as the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and whether the interviewee was released at the end of the questioning. *Howes*, 565 U.S. at 509. The Eleventh Circuit further instructs that it is also appropriate to consider "whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled," *Luna-Encinas*, 603 F.3d at 881 (internal quotation marks omitted), as well as whether the suspect was told "that he is free to leave and is not in custody," *Brown*, 441 F.3d at 1347. Although no factor is outcome determinative, *id.* at 1349, certain factors—location and whether the defendant was told that he was free to leave—seem to be of particular importance. The Eleventh Circuit has held that although "the location of the interview is surely not dispositive in determining whether the interviewee was in custody, courts are *much less likely* to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home." *Id.* at 1348 (internal quotation marks and alteration omitted,

emphasis in original). And about telling a suspect that he is free to go, the circuit has instructed trial courts that

> advising a defendant that he is free to leave and is not in custody is a powerful factor in the mix, and generally will lead to the conclusion that the defendant is *not* in custody absent a finding of restraints that are so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview.

*Id.* at 1347 (internal quotation marks omitted, emphasis in original). The test is an objective one: "the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant" and "the reasonable person from whose perspective 'custody' is defined is a reasonable *innocent* person." *Id.* (internal quotation marks omitted, emphasis in original). And finally, the burden is on the defendant to establish that he was in custody. *See United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977); *United States v. Jenkins*, No. 1:18-CR-181, 2019 WL 1568154, at *6 (N.D. Ga. Apr. 11, 2019); *United States v. Peck*, 17 F. Supp. 3d 1345, 1353–54 (N.D. Ga. 2014).

As an initial matter, the Court finds that Defendant was subject to interrogation—and the Government does not argue to the contrary. Regarding whether Defendant was in custody, the Court first concludes that Defendant was not free to leave and was therefore seized. Indeed, Agent Ballard testified that Defendant was detained and was not free to leave the house. (Doc. 54 at 48). In light of all of the factors, however, the Court finds that a reasonable person would

14

not have understood their freedom of action to have been curtailed to a degree associated with a formal arrest, and Defendant was therefore not in custody for purposes of *Miranda*.

First, and significantly, the interview occurred in a bedroom of Defendant's home. This fact makes it "*much less likely*" that the interview was custodial. *Brown*, 441 F.3d at 1348 (emphasis in original); *see also United States v. Matcovich*, 522 F. App'x 850, 852 (11th Cir. 2013) (affirming a finding that a defendant was not in custody in part because the interview took place in the defendant's home); *Luna-Encinas*, 603 F.3d at 882 (finding a defendant was not in custody in part because the interview took place on the "familiar ground" of his own front yard); *Jenkins*, 2019 WL 1568154, at *6 (denying a motion to suppress statements where defendant was in the "familiar setting" of his home); *United States v. Kight*, No. 1:18-CR-169-TWT-RGV, 2019 WL 1781356, at *10 (N.D. Ga. Mar. 11, 2019) (holding that the fact that an interview took place in the defendant's residence "strongly militates against a finding that the interrogation was custodial"), *adopted by* 2019 WL 1778048 (N.D. Ga. Apr. 23, 2019); *United States v. Illonzo*, No. 1:12-CR-276-SCJ-GGB, 2015 WL 5827598, at *27 (N.D. Ga. Oct. 6, 2015) (finding defendant not in custody where the interview took place in the dining room of her home).

Second, the interview with Aquino-Bustos was relatively short in duration. It lasted for approximately 39 minutes, (Gov. Exh. 1), and it ended at 7:15 p.m., *id.*

15

at 38:00–39:00. Agents entered the house at approximately 5:38 p.m., (Doc. 54 at 66), meaning that the time from entry to completion of the interview was about an hour and a half. The Eleventh Circuit has found even longer periods to not constitute custody for purposes of *Miranda*. *United States v. McDowell*, 250 F.3d 1354, 1363 (11th Cir. 2001) (four hours); *United States v. Muegge*, 225 F.3d 1267, 1269–71 (11th Cir. 2000) (about two-and-a-half hours); *see also Peck*, 17 F. Supp. 3d at 1361–62 (detention prior to and during questioning of approximately one hour). The length of Defendant's detention points to her not being in custody.

Third, there were no physical restraints during the questioning. Although Defendant was initially handcuffed after the agents entered her home, the handcuffs were removed by the time of the interview. (Doc. 54 at 17, 101–02, 106). And the agents never touched her during the interview. *Id.* at 107. The lack of any physical restraints weighs in favor of finding that Defendant was not in custody. *See, e.g.*, *Peck*, 17 F. Supp. 3d at 1362–63 (defendant not in custody where he was not "handcuffed, physically restrained, or otherwise touched" during the questioning); *United States v. Graham*, No. 3:13-CR-11-TCB, 2014 WL 2922388, at *6–7 (N.D. Ga. June 27, 2014) (finding defendant not in custody where there were no handcuffs present during his in-home interview, even though he had earlier been handcuffed during the execution of the search warrant).

16

Fourth, there were no visible weapons during Defendant's interview. (Doc. 54 at 20). Although agents had firearms visible when they entered the house, none were displayed or brandished during the actual interview, which weighs in favor of finding that Defendant was not in custody. *See Kight*, 2019 WL 1781356, at *10 (finding that the defendant was not in custody where the agents holstered their weapons during the interview and did not touch the defendant); *Graham*, 2014 WL 2922388, at *6 (noting that the agents' weapons were holstered during the interview); *Peck*, 17 F. Supp. 3d at 1364.

Fifth, the tone of the agents was, in Defendant's own words, "passive." (Doc. 54 at 112). This fact weighs in favor of finding that Defendant was not in custody.

Finally, Defendant was arrested on the night of her interview. This fact weighs in favor of finding that she was in custody. *Howes*, 565 U.S. at 509.

All told, the totality of the facts suggest that a reasonable person in Defendant's situation would not have felt their freedom to have been curtailed to a degree associated with formal arrest. Defendant was interviewed in a bedroom of her home, she was not restrained during the interview, no guns were visible, and her detention lasted for about an hour and a half. Although agents never told Defendant that she could leave — which is a fact that weighs in her favor — the lack of such a warning does not turn an otherwise non-custodial interview into one that requires *Miranda* warnings. *See, e.g., Illonzo*, 2015 WL 5827598, at *27 (finding that

17

the defendant was not in custody, even though she was not told that she could leave). Indeed, although Defendant was not expressly told that she could leave, nor was she told that she was under arrest—which is a fact that the Eleventh Circuit has considered in finding that a person is not in custody. *See United States v. Gomes*, 279 F. App'x 861, 869 (11th Cir. 2008) ("Gomes was not physically restrained in any way and he was not told that he was under arrest, which are two additional factors that weigh against a finding of custody."); *United States v. Phillips*, 812 F.2d 1355, 1362 (11th Cir. 1987) (considering the fact that a defendant was never told that he was under arrest). The Court concludes that Defendant was not in custody and that *Miranda* warnings were therefore not required.[4] As such, the undersigned **RECOMMENDS** that Defendant's motion to suppress her statements based on an alleged *Miranda* violation (arguments partially contained within section I of her brief and fully within section II) be **DENIED**.

### 2. Voluntariness

Defendant also moves to suppress her statements on the ground that they were not voluntary. Specifically, she argues that agents told her that she should

---

[4] If the District Judge declines the undersigned's recommendation and determines that Defendant was in custody, the Government has stated that, under such circumstances, it will not seek to use any of Defendant's pre-*Miranda* statements. (Doc. 58 at 13 n.3).

cooperate to help herself, that Agent Ballard had the power to decide if she would be arrested based on whether she decided to cooperate, and that agents used the possibility of Defendant's dogs going to animal control (if she were arrested) as leverage to get her to talk. (Docs. 56 at 12–14; 64 at 2–5). The Government argues that Agent Ballard said nothing unduly coercive and that the agents' statements about the possibility of Defendant being arrested were entirely truthful. (Doc. 58 at 15–17).

Even though the Court has determined that there was no *Miranda* violation, it "still must determine that any confessions or incriminatory statements made by a defendant were voluntary" before those statements can be admitted at trial. *United States v. Lazarus*, 552 F. App'x 892, 895 (11th Cir. 2014). A court looks at the totality of the circumstances when evaluating voluntariness, and the question ultimately is whether the defendant's statement "was the product of an essentially free and unconstrained choice." *Hubbard v. Haley*, 317 F.3d 1245, 1252 (11th Cir. 2003) (internal quotation marks omitted). Among the factors a court should consider "are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." *Id.* at 1253.

"Those cases where courts have found confessions to be involuntary have contained a substantial element of coercive police conduct." *United States v.*

*Patterson*, No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *4 (N.D. Ga. Aug. 10, 2007)
(internal quotation marks omitted). "Sufficiently coercive conduct normally
involves subjecting the accused to an exhaustingly long interrogation, the
application of physical force or the threat to do so, or the making of a promise that
induces a confession." *United States v. Thompson*, 422 F.3d 1285, 1295–96 (11th Cir.
2005) (internal quotation marks omitted).

Defendant points to several statements of the agents that she argues were
sufficient to overcome her will. First, she argues that prior to when the recording
started, Agent Ballard told her that he had the power to either let her go or arrest
her, and that it all depended on whether she wanted to cooperate. (Doc. 54 at 108).
Agent Ballard testified that he could not remember if he had a conversation with
Defendant prior to the recorded one, but that he typically tells interviewees that
their "chance to talk is before you are Mirandized—before you ask for a lawyer
because once you get a lawyer, it stops." *Id.* at 129. He testified that the phrase
"that I have the power to put you in jail or lock you up is not something that I can
recall ever using" and that he found such an accusation "extremely offensive." *Id.*

Defendant next points to statements the agents made to her well after the
recorded interview started. At a certain point in the discussion, it became clear that
the agents did not entirely believe what Defendant was telling them. They began
telling her that they doubted what she was saying, that there was the possibility

that when they interviewed Penaloza-Bravo he would try to shift the blame to her, and that if she was not being truthful, now was the time to come clean. (*See, e.g.,* Gov. Exh. 1 at 20:15–24:42; 26:45–28:10; 35:10–36:04). Agent Ballard directly told Defendant that if Penaloza-Bravo tells him that Defendant is involved, Ballard will have no choice but to assume that she is and arrest both of them that night. *Id.* at 21:07. And the agents pointed out to Defendant that if she does end up getting arrested, she would need to make arrangements for someone to come get her dogs, who would otherwise have to go to the DeKalb County pound. *Id.* at 21:07–24:42. Defendant assured the agents that her mom would come to get the dogs if she got arrested. *Id.* at 35:10.

Defendant cites no cases in either her brief or reply brief where any court has found similar statements by an agent sufficient to overcome a defendant's will such that an ensuing statement would be involuntary. Nor has the Court located any in its own research. At the time of the search, Defendant was 24 years old and was training as an electrician. (Gov. Exh. 1 at 17:30, 34:20). The interview was over within an hour and a half of when the agents entered the house, and it took place in a bedroom in Defendant's home. The agents never used any physical force during the interview, and they made no promises. All of the factors that the Court should consider, *Hubbard*, 317 F.3d at 1253, counsel in favor of finding that the confession was voluntary.

Defendant makes much of the conversation that she says occurred before the recording started. She says that Agent Ballard told her that he had the power to either let her go or arrest her, and that it all depended on whether she wanted to cooperate. (Doc. 54 at 108). Agent Ballard testified that he could not remember if he had a conversation with Defendant prior to the recovered one, but that he typically tells interviewees that their "chance to talk is before you are Mirandized—before you ask for a lawyer because once you get a lawyer, it stops." *Id.* at 129. He testified that the phrase "that I have the power to put you in jail or lock you up is not something that I can recall ever using" and that he found such an accusation "extremely offensive." *Id.* The Court finds Ballard's testimony more credible. The undersigned watched him while he testified, and he appeared to be telling the truth when he said that he had never used the phrase that Defendant attributed to him; he appeared truly offended when he said that the accusation was offensive. Moreover, the Court finds that Agent Ballard has no reason to lie, while Defendant has a decided interest in the outcome of this litigation.

And assuming Ballard told Defendant what he testified that he typically tells interviewees—that any interview will have to stop if she decides to invoke her right to an attorney—the Court finds nothing coercive about that truthful statement. *See United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1475 (11th Cir. 1992) (noting that "discussions of realistic penalties for cooperative and non-cooperative

22

defendants are normally insufficient to preclude free choice" (citation omitted)); *United States v. Ballard*, 586 F.2d 1060, 1063 (5th Cir. 1978) (holding that telling an interviewee "in a noncoercive manner of the realistically expected penalties and encouraging her to tell the truth is no more than affording her the chance to make an informed decision with respect to her cooperation with the government"). Indeed, even if, as Defendant testified, Ballard told her that he had the power to arrest her and that "it depended on if I wanted to" cooperate, other courts have found similar statements non-coercive. *See United States v. Mendoza*, 85 F.3d 1347, 1351 (8th Cir. 1996) (agent's statement that defendant "would be arrested immediately if she did not cooperate," by itself, "was not so coercive as to deprive [the defendant] of her ability to make an unconstrained decision to confess"); *United States v. Sablotny*, 21 F.3d 747, 753 (7th Cir. 1994) (holding that "the police did not exceed their bounds by frightening [the defendant] with the specter of jail, a prospect of which she must have been well aware in any event").

Nor were any of the statements by the agents during the recorded part of the interview unduly coercive. The agents informed Defendant that they did not think she was being truthful, encouraged her to tell the truth, informed her that they would have to arrest her if Penaloza-Bravo said she was involved, and asked her to think about whether anyone was available to pick up her dogs if she were arrested. As noted by the former Fifth Circuit, "[e]ncouraging a suspect to tell the

23

truth and suggesting that his cohorts might leave him 'holding the bag' does not, *as a matter of law*, overcome a confessor's will." *Ballard*, 586 F.2d at 1063 (emphasis added). The Court also notes that Defendant was read her *Miranda* rights and that she testified that she understood those rights. (Doc. 54 at 110); *Mendoza-Cecelia*, 963 F.2d at 1475 (finding that a statement was "free of inducements or coercive factors" in part because the defendant was read his *Miranda* rights). And the statements at issue here are less coercive than others that the Eleventh Circuit has considered. In *Mendoza-Cecelia*, agents told the defendant that "if you don't cooperate with us, ten years can be a long time in jail. Anything can happen and something can happen to your family, something can happen to your mother, your father." 963 F.2d at 1475. The court found that those statements did not deprive the defendant of his ability to freely and voluntarily choose to make a statement, and the statements here are even less suggestive or coercive. And finally, there is no evidence whatsoever of an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induced the statements. *Thompson*, 422 F.3d at 1295–96. Simply put, the agents did nothing to overcome Defendant's free and unconstrained choice to talk, and her motion to suppress her statements as involuntary should be **DENIED**.

B.     **The Consent Search of Aquino-Bustos's Phone**

Defendant argues that her consent to search her phone was not voluntary and that, even if it was, the agents exceeded the scope of the consent by searching it after the day of arrest. Defendant further argues that the agents' repeated use of her passcode violated her Fifth Amendment rights.

1.     **Defendant's Consent was Voluntary**

Agent Ballard asked Defendant if he could search her phone, and she said that he could. (Gov. Exh. 1 at 8:15–8:30). The agent asked again, approximately 20 minutes later, and Defendant again told him that he could search her phone. *Id.* at 29:25–30:05. And she gave him the passcode that he needed to open it. *Id.* Defendant argues that the consent was not voluntary because agents made her feel uncomfortable by asking her questions about her immigration status and that of her family members, took the phone off of her person, and conditioned her ability to avoid arrest on her cooperation. (Doc. 56 at 15–17). The Government argues that Defendant understood her *Miranda* rights, told the agents they could search the phone, never displayed any signs of hesitation, voluntarily gave them her passcode, and never attempted to withdraw her consent. (Doc. 58 at 18–19).

"While the Fourth Amendment prohibits unreasonable searches, a search is reasonable and does not require a warrant if law enforcement obtains voluntary consent." *United States v. Morales*, 893 F.3d 1360, 1367 (11th Cir. 2018) (internal

quotation marks and alteration omitted). That is, to be voluntary the consent must be "the product of an essentially free and unconstrained choice." *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001) (internal quotation marks omitted). "But beyond that, there is no neat talismanic definition of voluntary consent." *Morales*, 893 F.3d at 1367 (internal quotation marks and alteration omitted). A court should consider the totality of the circumstances, including the

> voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found.

*United States v. Spivey*, 861 F.3d 1207, 1213 (11th Cir. 2017) (internal quotation marks omitted). It is the Government's burden to demonstrate both that consent was given and that it was done so freely and voluntarily. *United States v. Yeary*, 740 F.3d 569, 581 (11th Cir. 2014).

For many of the same reasons noted above, the Court finds that Defendant's consent to search her phone was voluntary. Defendant was informed of her right to remain silent, yet she elected to talk with the agents. The undersigned has listened to the recording of the interview, and she did not express any hesitation when Agent Ballard asked if he could search her phone. Indeed, she readily provided the passcode when the agent appeared to struggle with accessing the

device. (Gov. Exh. 1 at 29:25–30:05). The conversation between Defendant and the agents was calm, nobody raised their voices, Defendant was not handcuffed, the agents' firearms were not visible, and the consent occurred in the bedroom of Defendant's home. And, as noted above, Defendant was an adult at the time of the consent training to work as an electrician—which suggests that she is a competent, intelligent person. While it is true that Agent Ballard did not expressly advise her that she did not have to consent to the search of the phone, he was under no obligation to do so. *Spivey*, 861 F.3d at 1216.

Defendant argues that she was uncomfortable in light of Agent Ballard's questions about her immigration status and that of her parents, which she argues were done to "set the stage" for her "to acquiesce to officer requests." (Doc. 56 at 16). The Court simply does not find that those questions about her immigration status were sufficient to override her free will to consent to a search of her phone. By the time she consented, she had been informed that she had the right to remain silent, yet she continued to speak with the agents. And she does not sound intimidated or scared on the recording. Defendant's tone (like that of the agents) was conversational, and she did not hesitate at all prior to giving consent.

Nor does the fact that the agents' weapons were visible when they first made entry into the home, or that Defendant had been handcuffed earlier in the afternoon, change the analysis. In *United States v. Espinosa-Orlando*, agents pulled

27

over a car, ordered the driver out at gunpoint, and directed him to lie on the ground. 704 F.2d 507, 510 (11th Cir. 1983). Three of the agents reholstered their guns, while a fourth stood apart with his weapon pointed to the ground. *Id.* at 513. One of the agents knelt down next to the defendant, who was still lying on the ground, and asked for consent to search the car. *Id.* The defendant consented to the search, and the Eleventh Circuit affirmed the district judge's determination that it was voluntary, noting that the agent spoke in a conversational tone, used no abusive language or threats, and that defendant had not been handcuffed, placed in a police vehicle, or removed from the scene. *Id.* The circumstances in this case, which are noted and discussed above, are less coercive than those in *Espinosa-Orlando*, and given the totality of the facts, the Court finds that Defendant freely and voluntarily consented to the search of her phone. *See also United States v. Garcia*, 890 F.2d 355, 362 (11th Cir. 1989) (finding consent voluntary where the defendant was handcuffed and under arrest at the time of the consent).

### 2.   Subsequent Searches Did Not Exceed the Scope of Consent

Defendant argues that agents exceeded the scope of the consent—which she argues was limited to a search during the time of the interview—by searching it again on October 24. The Court does not agree.

"The scope of a consensual search is determined by the terms of the actual consent," *United States v. Martinez*, 949 F.2d 1117, 1119 (11th Cir. 1992), and such a

search becomes impermissible "when an officer does not conform to the limitations imposed by the person giving consent," *United States v. Zapata*, 180 F.3d 1237, 1242 (11th Cir. 1999). "When an individual gives a general statement of consent without express limitations, the scope of a permissible search is not limitless. Rather it is constrained by the bounds of reasonableness: what a police officer could reasonably interpret the consent to encompass." *United States v. Strickland*, 902 F.2d 937, 941 (11th Cir. 1990). "To ascertain what conduct is within the bounds of reasonableness, [the court] must consider what the parties knew to be the object (or objects) of the search." *Zapata*, 180 F.3d at 1243 (internal quotation marks omitted). The Government bears the burden of demonstrating that its search was within the scope of the consent received. *United States v. Plasencia*, 886 F.3d 1336, 1342 (11th Cir. 2018).

When Agent Ballard initially asked Aquino-Bustos if he could search her phone, it was to look for text messages and phone calls. (Gov. Exh. 1 at 8:15–8:30). Later in the interview, he reiterated that he wanted to search the phone to make sure there was nothing in it suggesting she was culpable and no messages about the package. *Id.* at 29:25. It is clear from those statements, as well as the overall nature of the interview, that the parties understood that the agents wanted to search the phone for evidence related to illegal drugs. Defendant agreed to the search of her phone without any limitations; indeed, she helped Agent Ballard

29

unlock it by giving him the passcode. *Id.* She placed no time limitations on the consent, she did not ask for her phone back, and agents did not return it to her. To this day, Defendant has not withdrawn her consent.

Under these facts, the Court finds that Defendant's consent was unlimited and that a reasonable officer would interpret the consent to allow searches of the entire phone for evidence of drug activity. Although Defendant could have limited her consent to the time of the interview, she did not. Nor would a reasonable officer have understood her consent to be so limited, and Defendant's consent permitted each of the subsequent searches of Defendant's phone. *See, e.g., United States v. Thurman*, 889 F.3d 356, 367–69 (7th Cir. 2018) (finding that a defendant's unlimited consent to search a phone during an interview concerning drug sales authorized a later forensic examination of that phone); *Plasencia*, 886 F.3d at 1342–43 (unlimited consent to search a boat justified a later forensic examination of a GPS unit located in the boat); *United States v. Emanuel*, 440 F. App'x 881, 885 (11th Cir. 2011) (holding that a defendant's consent to search his computer, which was not limited in time, authorized a forensic examination that occurred approximately eleven months later).

Defendant argues that she and the agent discussed only "a quick search" of the phone. (Doc. 56 at 18). But there is nothing in the record to support the temporal limitation Defendant seeks to graft onto her consent. Rather, the

transcript of the interview reveals that Defendant did not place any time limitations on her consent, the agent did not suggest any such limitations, Defendant never asked for the phone back, and the agent did not return it to her. There is simply no support for the notion that Defendant limited her consent to a "quick" search.

### 3. The Government did not violate Defendant's Fifth Amendment rights by using her phone passcode

Defendant argues that the Government violated her Fifth Amendment rights by obtaining and then using her phone passcode. (Doc. 56 at 18–21). The Court disagrees.

As noted above, Defendant voluntarily consented to an unlimited search of her phone. For the same reasons that the Court finds the consent to search voluntary, the Court likewise rejects Defendant's argument regarding the passcode. Agent Ballard did not even have to ask Defendant for the passcode to the phone—she offered it to him when she saw him struggling to unlock it. (Gov. Exh. 1 at 29:25). After Defendant consented to a search of her phone (for a second time), Agent Ballard started to unlock it. He began to ask "and how do I…," and before he could even finish his sentence, Defendant began reciting the passcode and offered the agent instructions on how to enter it on the screen. *Id.* Her decision to provide the passcode during the interview was voluntary, and she did not limit

the use of the passcode. Therefore, Agent Ballard validly used it again on October 24, 2018.

Defendant cites an opinion from this Court where a suspect gave up his passcode only after repeatedly refusing to do so, after he was then threatened with arrest for a parole violation if he refused to do so, and he was then arrested for his refusal. *United States v. Sanchez*, 334 F. Supp. 3d 1284, 1294 (N.D. Ga. 2018). The court noted that to prevail on a Fifth Amendment claim, a defendant has to show compulsion, a testimonial act, and incrimination. *Id.* Here there are no facts even remotely similar to those in *Sanchez* and no evidence of compulsion. Defendant provided her passcode without even being asked and only after she voluntarily consented to an unlimited search of her phone. There was no coercive conduct by the agents, and there was nothing improper about the agents' use of her passcode during the interview and during each subsequent search. As such, Defendant's motion to suppress evidence recovered from her phone should be denied in light of her valid consent.

### 4. The Search Warrants

As outlined above, Defendant's motion to suppress evidence recovered from her phone is due to be denied because she voluntarily consented to a search of that phone. The Government did, however, obtain two search warrants for the phone (the first was not executed), and Defendant challenges the length of time

32

the Government took to obtain the operative warrant (the second one), that the warrant was overbroad, and that the Government exceeded the scope of the warrant. (Doc. 56 at 22–35). In light of the Court's finding regarding consent, the Court declines to address the arguments regarding the search warrants. *See United States v. Calixte*, 591 F. App'x 929, 930 (11th Cir. 2015) (finding that an 11-month delay in searching a flash drive did not render the search unreasonable because the defendant had consented, meaning that the Fourth Amendment did not require a warrant).

## III.   Penaloza-Bravo's Motion to Suppress Statements

Penaloza-Bravo seeks to suppress the statements that he made in his brief interview with Agent Ballard, arguing that they were obtained in violation of *Miranda* and that they were involuntary. (Doc. 55 at 6–14). The Government, in its response brief, asserts that it will use at trial only one of Defendant's[5] statements from the interview—that his nickname is "Weyo." (Doc. 58 at 10 n.2). The Government argues that Defendant was not in custody and that even if he was, the question about his nickname falls into the exception for routine booking inquiries. *Id.* at 6–13.

---

[5] In Part III of this Report and Recommendation, I use "Defendant" to refer to Mr. Penaloza-Bravo.

A.     **Penaloza-Bravo was not in Custody**

The analysis regarding whether Penaloza-Bravo was in custody is very similar to that which applies to Aquino-Bustos. As with Aquino-Bustos, the interview of Penaloza-Bravo took place in a bedroom in his home. (Doc. 54 at 33–34; Gov. Exh. 1 at 9:38 (Aquino-Bustos's statement that the other person in the house at the time of the search, whom she identified as Weyo, lives in the house)). Defendant's interview began at approximately 7:21 p.m., which is about one hour and 43 minutes after agents first entered the house, and it concluded less than 11 minutes after it began. (Def. Exh. 4 at 1; Doc. 54 at 66). There were two agents present during the interview, both of whom were armed with weapons that were not visible. (Doc. 54 at 36). By the time of the interview, Defendant was wearing pants and a shirt (he was wearing only underwear when agents first entered the home). *Id.* at 35. And although Defendant was handcuffed when agents initially made entry into the house, Agent Ballard could not remember if Defendant was handcuffed during the interview. *Id.* at 35–36. Agent Ballard read Defendant his *Miranda* warnings, Defendant said that he wanted a lawyer, and Agent Ballard then proceeded to ask him a number of questions, including his name, his parents' names, his date of birth, where he was born, when he last entered the United States, what time of day he crossed the border, how long it took him to cross the border, how much he paid the guide to assist with his crossing, whether he had

34

legal status to be in the United States, and whether Aquino-Bustos calls him by the name Guello. (Doc. 54 at 39; Def. Exh. 4).[6]

For the purposes of determining custody, the Court discerns only minor differences between Aquino-Bustos's situation and that of Penaloza-Bravo. First, the timeframe associated with Penaloza-Bravo's interview is slightly longer than that for Aquino-Bustos because he was interviewed second. But even so, his interview concluded just under two hours after agents first entered the home (Aquino-Bustos's timeframe was closer to an hour-and-a-half), and this fact does not materially change the analysis. *See McDowell*, 250 F.3d at 1363 (timeframe of four hours and defendant was not in custody); *Muegge*, 225 F.3d at 1269–71 (about two-and-a-half hours); *see also Peck*, 17 F. Supp. 3d at 1361–62 (detention prior to and during questioning of approximately one hour). As with Aquino-Bustos, the length of Defendant's detention points to him not being in custody.

A second difference is that Agent Ballard is not sure if Defendant was in handcuffs during his interview, (Doc. 54 at 36), whereas it is clear that Aquino-Bustos was not, *id.* at 102. But this fact (or lack of a fact) does not substantially change the analysis because the burden is on Defendant to demonstrate that he was in custody, and the evidence on this fact is inconclusive. The Court notes that

---

[6] As noted above, the Government intends to use only the answer Defendant provided about his nickname.

35

although Defendant was initially handcuffed after agents first entered the home, Defendant was allowed to get dressed before the interview (including putting on a shirt), which suggests that at some point the handcuffs must have come off.

Those two differences aside, the scenarios of Aquino-Bustos and Penaloza-Bravo are otherwise similar for the purposes of determining custody. And for the reasons stated above regarding Aquino-Bustos, the Court similarly determines that Penaloza-Bravo was not in custody at the time of his interview. As such, he was not entitled to *Miranda* warnings, and the statements he made were not obtained in violation of *Miranda*.

### B.   Penaloza-Bravo's Statements were Not Voluntary

Penaloza-Bravo argues that his statements were not voluntary, noting that he told Agent Ballard that he wanted a lawyer, that the agent asked him questions anyway, and that the agent told him that the questions were only for immigration purposes and "not for the criminal part of this thing." (Def. Exh. 4 at 5; Doc. 55 at 14–16). The Government does not address this argument in its brief; it addresses the voluntariness argument as to Aquino-Bustos, but not as to Penaloza-Bravo.

Agent Ballard began the interview with Defendant by reading him his *Miranda* rights. (Def. Exh. 4 at 2). Defendant told the agent that he wanted to talk to a lawyer. *Id.* In response, the agent told Defendant that, because he was invoking his right to an attorney, all the agent could do was ask him "biographic

36

information." *Id.* at 3. Defendant gave the agent his name and then, in response to a question about Defendant's father's name, Defendant pushed back, stating "It's just that I don't…It's just that I, frankly…you are asking me questions, and you told me that, you read me my rights, no?" *Id.* at 5. The agent then made clear that he was asking questions only for immigration purposes: "No, this is on the part of Immigrations, this is for administration, this…I need your true name for the Immigration part. *This is not for the criminal part of this thing here. We are not talking that.*" *Id.* (emphasis added). Later in the conversation, after the agent asked Defendant if he "live[d] here?" Defendant again hesitated, asking "that would be…a question for that other thing there, right?" *Id.* at 7. The agent, apparently understanding Defendant's concern that the question related to the criminal narcotics investigation, assured Defendant "No, it's, it's a question for Immigration." *Id.* The agent and Defendant then talked about how Defendant entered the country and, at the very end of the interview, the agent asked Defendant about his name: "You have Aurelio then she calls you Guello?" *Id.* at 14. Defendant answered "It's my name, like Guello and Yeyo, it's like my short name. Like, uh, Roberto is Rober." *Id.* The agent clarified that "Oh. So Guello is short for, for Aurelio?" and Defendant said, "Exactly. Exactly." *Id.*

Defendant argues that the Government's failure to address voluntariness as to him should result in a waiver. (Doc. 63 at 1-2). Because the Court agrees with

Defendant that his statement was not voluntary, the Court declines to address the waiver argument. "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." *Thompson*, 422 F.3d at 1295–96 (internal quotation marks omitted). Here the interview lasted less than 11 minutes, there was no force or the threat of force, but there was a promise given to Defendant—that the discussion was "not for the criminal part of this thing here"—that rendered his subsequent statement (which the Government is trying to use in the criminal case) involuntary.

When it comes to police misrepresentations to a suspect, misrepresentations of fact (for example, falsely telling a suspect that his fingerprints were found at the scene of the crime) "are not enough to render a suspect's ensuing confession involuntary." *United States v. Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010). Misrepresentations of law, on the other hand (for example, telling a suspect that his statements could not be used against him) "are much more likely to render a suspect's confession involuntary." *Id.* at 1285–86. Indeed, a promise from law enforcement not to use a suspect's statement "may be the most significant factor in assessing the voluntariness of an accused's confession in light of the totality of the circumstances." *Id.* at 1286 (internal quotation marks omitted). In *Lall*, a police officer told a suspect that anything he said would not be used to prosecute him.

38

*Id.* at 1287. That promise, the Eleventh Circuit held, was "sufficient to render" the ensuing confession involuntary. *Id.*; *see also United States v. Castor*, 598 F. App'x 700, 701, 703 (11th Cir. 2015) (holding that an officer's statement to a suspect that the officer could not charge him with any additional drugs rendered the subsequent confession to additional drugs involuntary).

Here Agent Ballard's statement to Defendant that his questions were for immigration purposes and "not for the criminal part of this thing" is materially indistinguishable from the promise in *Lall* that the defendant's statements would not be used to prosecute him. Indeed, Defendant told Agent Ballard that he wanted a lawyer, expressed hesitation about answering the agent's questions, and continued the discussion only after being assured that the inquiry was for immigration purposes and not for the criminal part of the investigation. (Def. Exh. 4 at 5). Under those facts, as in *Lall* and *Castor*, the Court concludes that Defendant's statements were not voluntary and must be suppressed.

The Government argues that the statements fall within the exception for routine booking questions. (Doc. 58 at 10–13). The Supreme Court has recognized a "routine booking question exception" that exempts from *Miranda*'s coverage questions to secure "biographical data necessary to complete booking or pretrial services." *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (internal quotation marks omitted). The exception allows officers to ask questions about a person's name,

address, height, weight, eye color, date of birth, and age, which are deemed to be administrative in nature and therefore outside the protection of *Miranda*. *Id.* at 601–02. Nevertheless, even during booking, officers are not permitted to ask questions that are designed to elicit an incriminating response. *Id.* at 602 n.14. As the Eleventh Circuit has explained:

> We emphasize that police may not use routine biographical questioning as a guise for obtaining incriminating information. If investigative questions are asked while routine information is being obtained—as apparently were asked in this case—answers to such questions are inadmissible if the suspect has not been read his Miranda rights. Even questions that usually are routine must be proceeded by Miranda warnings if they are intended to produce answers that are incriminating.

*United States v. Glen-Archila*, 677 F.2d 809, 816 n.18 (11th Cir. 1982) (internal citation omitted).

Here, of course, the problem is not that Defendant was questioned in violation of *Miranda*—he was not in custody. Instead, Defendant's statements should be suppressed because they were involuntary. But even if there were a *Miranda* problem, the routine booking exception would not save the statements because the agent intended to illicit an incriminating response when he asked Defendant if "she calls you Guello?" (Def. Exh. 4 at 14).

40

To recap, by the time of Defendant's interview, Agent Ballard had already interviewed Aquino-Bustos, who identified the other person in the house (where agents found suspected methamphetamine, a gun, and other materials related to narcotics) as "Weyo." (Gov. Exh. 1 at 8:48–9:10). So when Agent Ballard interviewed Defendant, he had a clear interest in confirming that Defendant was the "Weyo" identified in the course of Aquino-Bustos's interview. Indeed, the agent did not ask Defendant "do you have a nickname" or "what is your street name." Rather, he asked whether "she" (an obvious reference to Aquino-Bustos, the only other person in the house) "calls you Guello?" (Def. Exh. 4 at 14).[7] The form of the question makes clear that Ballard was trying to confirm that he was talking to the person that Aquino-Bustos identified in her interview. The question, therefore, which was designed to elicit an incriminating response, would not have been covered by the routine booking exception even if this were a scenario where *Miranda* applied. *See United States v. Chavez-Maciel*, No. 1:10-CR-490-TCB-LTW, 2012 WL 6742323, at *9–10 (N.D. Ga. Dec. 7, 2012) (holding that a question about a defendant's aliases, that was asked for interrogation purposes, fell outside the

---

[7] The transcripts and briefs spell the relevant name in a number of ways, including "Weyo" and "Guello." It is clear that, regardless of the spelling, the references are to the other man in the house that Aquino-Bustos referenced in her interview.

exception for routine booking questions), *adopted by* 2012 WL 6738771 (N.D. Ga. Dec. 31, 2012). All told, Defendant's statements to Agent Ballard were not voluntary, and they should be suppressed.

## IV.   Conclusion

For the reasons stated above, the undersigned **RECOMMENDS** that Defendant Aquino-Bustos's motion to suppress evidence seized from her cell phone, (Doc. 39), be **DENIED AS MOOT**, that Defendant Aquino-Bustos's motion to suppress statements, (Doc. 41), be **DENIED**, that Defendant Aquino-Bustos's amended motion to suppress evidence seized from her cell phone, (Doc. 44), be **DENIED**, and that Defendant Penaloza-Bravo's motion to suppress statements, (Doc. 50), be **GRANTED**. Defendant Penaloza-Bravo's motion to sever, (Doc. 48), is **DEFERRED** to District Judge Mark H. Cohen.

This matter is now **READY FOR TRIAL**.

**IT IS SO RECOMMENDED,** this 21st day of November, 2019.

_____
CHRISTOPHER C. BLY
UNITED STATES MAGISTRATE JUDGE